*487 OPINION OF THE COURT
John M. Czygier, Jr., S.
Before the court is a motion to dismiss objections filed to the account of the estate fiduciary and a cross motion by said object-ant for an order granting summary judgment. For the reasons set forth herein, the motion is denied and the cross motion is granted, solely to the extent outlined herein.
Background
Dianne Edwards died on December 17, 2008 as a result of what was described in her death certificate as “neck compress.” Her son-in-law, Brandon Palladino, was charged with murder in the second degree, as well as lesser included offenses, in connection with this death. On October 12, 2010 he entered a plea of guilty to manslaughter in the first degree in satisfaction of the charges against him and was subsequently sentenced to 25 years in prison. As part of the plea negotiation, he waived his right to appeal. Brandon Palladino’s wife, Deanna Palladino, was the sole beneficiary of her mother’s estate. Dianne Edwards’ will was admitted to probate in this court on October 5, 2009 and letters testamentary with limitations (a wrongful death action was referenced in the probate petition) issued to Dennis Gleason (an ex-spouse), who has since been substituted by order of the court (August 29, 2011) by successor fiduciary Gail O’Connell. The sole asset of the estate was decedent’s house in Melville, New York. On February 9, 2010, Deanna Palladino died intestate as a result of an accidental drug overdose, according to the parties. Her sole distributee was her husband, Brandon Palladino. He designated his mother, Donna DiRusso, to receive letters of administration for Deanna Palladino’s estate.
The accounting before the court reflects the sale of the decedent’s Melville property and a principal balance on hand of approximately $262,000. Instead of a proposed distribution schedule, the accounting fiduciary asks the court for direction on whether to pay funds on hand to the estate of decedent’s post-deceased beneficiary (her daughter Deanna, whose sole distributee is Brandon Palladino) or to the decedent’s sister Donna Larsen.
Donna Larsen (Larsen) filed objections to the account, alleging that she is the decedent’s only sibling and that Brandon Palladino has forfeited his right to inherit, through the estate of his wife, assets attributable to his mother-in-law’s estate, as a *488 matter of public policy, since he caused the death of the person whose funds would inure to his benefit through his post-deceased spouse’s estate.
The administrator of Deanna Palladino’s estate (DiRusso) has also appeared in the accounting proceeding and has moved to dismiss the objections filed by Donna Larsen. Larsen has cross-moved for summary judgment on her objections.
Arguments
DiRusso’s attorney argues that the course urged by Larsen is counter to the decedent’s testamentary scheme and the laws of intestacy. She also claims that the decedent and Larsen had been estranged for years as a result of a bitterly contested accounting in the estate of their mother. In fact, it is alleged that the house owned by decedent at her death was one of the assets in dispute during the prior accounting proceeding involving the two siblings. DiRusso advises that Deanna and Brandon dated since high school, moved to Florida during Deanna’s college years and returned to live with DiRusso, when they returned to New York. It is also alleged that Deanna and the decedent were close, talked and visited daily, and that the decedent assisted her daughter financially. DiRusso maintains that, even after his indictment, Deanna never wavered in her support of Brandon.
It is DiRusso’s contention that, since Deanna’s death, Larsen has engaged in a media campaign to implicate Deanna in her mother’s death. During Brandon’s sentencing on October 12, 2010, the Assistant District Attorney advised the court that Larsen and her husband had contacted the District Attorney’s Office in order to negotiate a deal with Brandon that would allow them to collect the proceeds of sale of the decedent’s house. The District Attorney’s Office refused to negotiate a sentence for Brandon based on funds being paid to the Larsens.
DiRusso also advises that Brandon is in the process of appealing his conviction.
The gravamen of the motion to dismiss the objections to the accounting is that Larsen lacks standing to object thereto. It is DiRusso’s contention that Larsen could only seek to disqualify Brandon within the context of the accounting to be brought by the administrator of Deanna’s estate, which is not before the court. The unconditional bequest in decedent’s will vested in Deanna upon the decedent’s death. DiRusso posits that, since Brandon had no involvement in Deanna’s death, he cannot be disqualified as a distributee of Deanna’s estate; therefore, at *489 tempting to seek his disqualification in the decedent’s estate is merely Larsen’s attempt to establish a closer nexus between this decedent’s death and the disqualifieation/forfeiture issue. To do so would also prejudice the rights of any creditors of Deanna’s estate.
Further, DiRusso maintains that Larsen is urging a result that extends beyond the tenets of Riggs v Palmer (infra) and its progeny, which prevent a murderer from inheriting from his victim’s estate.
In her cross motion for summary judgment on her objections to the accounting, Larsen disputes the characterization of her relationship with the decedent, while acknowledging that their relationship suffered as a result of the intense dispute over their mother’s estate. She also acknowledges statements made to the media but does not apologize for her dismay upon learning that Brandon pleaded guilty to acts resulting in this decedent’s death, but still seeks to claim assets from her estate.
A copy of the transcript of Brandon’s allocution before the Honorable Robert W. Doyle, Suffolk County Supreme Court reflects that Brandon admitted to entering the decedent’s home in order to steal jewelry when he was surprised by the decedent’s entering the upstairs bedroom. He fought with the decedent, held her in a headlock or choke hold and squeezed her neck intending to cause her serious physical injury. According to the decedent’s death certificate, the cause of death was “neck compression.” The plea bargain also included a waiver of Brandon’s right to appeal from the judgment of conviction, after an off-the-record discussion with his attorney.
In reply, DiRusso maintains that Larsen’s arguments do not confer standing on her to contest this decedent’s estate. The absolute bequest to Deanna vested upon captioned decedent’s death. Brandon, who is incarcerated, has not been cited, nor has a guardian ad litem been appointed to represent him, as one would if he were made a party to this accounting. She also maintains that contending that Deanna would have changed her mind about Brandon after his guilty plea is unsupported and speculative; and that Deanna believed in Brandon’s innocence. Further, she contends that the fact that Brandon would not be inheriting from his victim’s estate takes this matter out of the ambit of Riggs v Palmer (infra). She distinguishes the cases cited by Larsen’s counsel and notes that Matter of Macaro (infra) was limited to the circumstances before the court in that case. In addition, she claims that only the proximity of the two *490 deaths allows Larsen to make this argument, which would upend the laws concerning vesting. Finally, she asserts that Brandon’s waiver of his right to appeal is not conclusive nor does a guilty plea extinguish every claim (reply and opposition to cross motion at 14, H 28).
Discussion
Initially, it must be said that DiRusso’s counsel’s arguments concerning Larsen’s standing to assert her claims in this estate are well taken. This court is also concerned about the creditors of Deanna Palladino’s estate, if any. In fact, it is noted that, after initially showing an amount of $2,171.06 owed various creditors, the administration petition was amended to reflect that there were no creditors of Deanna’s estate. As this court sits as a court of equity with jurisdiction over both the Edwards and Palladino estates, it is in a unique position to fashion a remedy that would protect the interests of all involved. Further, the court doubts that a guardian ad litem appointed for Brandon Palladino could make a more eloquent argument in these proceedings than counsel for the fiduciary of Deanna Palladino’s estate; an argument made, essentially, on Brandon’s behalf.
Counsel for DiRusso relies a great deal on this court’s determination in Matter of Nager (NYLJ, Aug. 1, 2005, at 1, col 1). The circumstances in Nager (supra) were demonstrably different from those before the court on this application. In Nager (supra), the decedent’s stepson was accused of his murder. While criminal charges were pending, the decedent’s father petitioned the court for letters of administration, seeking the disqualification of decedent’s surviving spouse as her husband’s distributee. Among the arguments presented to the court at the time were the ongoing investigation into possible criminal liability on the part of the decedent’s wife and the use of funds received by her by operation of law upon her husband’s death for her son’s bail and defense. Notably absent from the Nager (supra) case were criminal charges, or indicia of the spouse’s complicity in her husband’s death, at the time the application for letters was brought in this court, other than the aforementioned investigation. Indeed, this court opined at the conclusion of its decision denying the issuance of letters of administration to decedent’s father that, in the event
“the aforementioned criminal investigation result [sic] in charges against the cross-petitioner, her status in this matter will be in jeopardy, and *491 petitioner may then be able to pursue the appropriate remedies. At this point in time, however, there is no basis in the record to disqualify the surviving spouse as a distributee or as the person with priority to be appointed fiduciary of subject decedent’s estate” (Matter of Nager, NYLJ, Aug. 1, 2005, at 1, col 1 [Czygier, S.]).
While there may be similarities, this court does not equate an, as yet, innocent spouse obtaining funds at her husband’s death, allegedly at the hands of her son, to a party (Brandon) obtaining funds left to his wife (Deanna) as a result of the death of his mother-in-law (captioned decedent Dianne), who he admitted choking until she expired.
Under the well-settled principle that one who takes the life of another should not be allowed to profit from his wrongdoing, Brandon Palladino could not, were such the case, inherit from captioned decedent’s estate (Riggs v Palmer, 115 NY 506 [1889]; Matter of Covert, 97 NY2d 68 [2001]; Matter of Sparks, 172 Misc 642 [1939]; Matter of Parente, 2009 NY Slip Op 33145[U] [2009]). This principle has been extended to life insurance proceeds (Matter of Loud, 70 Misc 2d 1026 [1972]) as well as Social Security death benefits (Matter of Grey v Levitt, 76 Misc 2d 720 [1974]), joint property interests (EPTL 4-1.6), and, in a case before this court, a law firm’s profit sharing plan (Estate of Pobo, Sur Ct, Suffolk County, June 3, 2011, Czygier, S., file No. 2010-3056/A). The wrinkle in the instant matter is that the funds at issue have already vested in the estate of Brandon Palladino’s wife, who was not implicated in the crime resulting in the death of her mother Dianne.
Of course, as noted by the parties, the seminal case is Riggs v Palmer (supra), wherein the Court of Appeals addressed the issue of whether a person who is a beneficiary under a will and who killed the testator in order to prevent his revocation of the will may profit by his wrongdoing. As the Court of Appeals opined: “No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime.” (Riggs at 511.)
This general proposition has been applied in a number of situations with varying results. In Matter of Covert (97 NY2d 68 [2001]), the Court of Appeals held that the innocent distributees of a wrongdoer who executed a murder-suicide are not disinherited by virtue of their familial relationship to the wrong *492 doer. In Matter of Macaro (182 Misc 2d 625 [1999]), relied upon by counsel for Larsen, Surrogate Emanuelli found that the convicted murderer of distributees interested in the estate of the decedent who died intestate could not succeed to their interests and disqualified the wrongdoer as a distributee of the decedent’s estate (after the appellate process had been exhausted).
Assuming the results are the same after this respondent has exhausted his appeals, if any, the undersigned finds that the language in Riggs (supra) may ultimately be applicable to the within situation. While not suggesting that a temporal analysis is determinative in cases such as this, had Deanna Palladino not post-deceased her mother so soon after Dianne Edwards’ death, Brandon Palladino’s expectation from his wife’s estate might not include the assets of his mother-in-law’s estate. In this case it is clear, however, that but for Brandon Palladino’s actions, there would be no inheritance to be obtained through his wife Deanna. Respondent made that possible; and, upon his conviction for manslaughter in the first degree (a class B felony defined under Penal Law § 125.20 [1] as intentionally causing serious physical injury to an individual resulting in such individual’s death), he should not be allowed to profit in any way thereby.
Counsel for DiRusso also urges this court to consider the fact that Deanna’s interest in the Edwards estate vested upon her mother’s death. The implication is that all inquiry should stop at that point. However, were Deanna eventually implicated in her mother’s death, the fact that her interest in the Edwards estate vested would not make her interest sacrosanct. Were that the case, Deanna would be subject to disqualification as a beneficiary/distributee, whether or not her interest had vested. This argument, therefore, is not persuasive.
While this court has also struggled with the fact that Deanna Palladino apparently supported her husband until her death, it is also cognizant of the fact that she died approximately eight months before Brandon Palladino pleaded guilty to the crime. Whether this would have changed Deanna Palladino’s mind-set is, of course, unknown; and to arrive at a conclusion one way or the other would be pure speculation. Here, no speculation is required to see the causal connection between the wrongdoing and the benefit. To ignore Brandon Palladino’s admission concerning captioned decedent’s death and reward his actions with an inheritance he would not have otherwise acquired, *493 albeit through the estate of his spouse, disturbs the conscience of the court, which as previously noted herein is a court of equity.
Although not on point, the holdings and the dicta supporting same from the Second Department’s decision in Campbell v Thomas (73 AD3d 103 [2010]) are instructive. In Campbell (supra), it was held that a woman who married a mentally incompetent man may have had a legal right to an elective share in his estate as surviving spouse, but forfeited any rights that flowed from the marital relationship by procuring the marriage through overreaching and undue influence. Citing Riggs v Palmer (supra), Matter of Covert (supra), Matter of Lonergan (63 NYS2d 307 [1946]), Barker v Kallash (63 NY2d 19 [1984]), and Carr v Hoy (2 NY2d 185 [1957]), the Second Department held that the Supreme Court, sitting as a court of equity as well as law, was empowered to grant relief consistent with the equitable principle that “[n]o one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime” (Campbell v Thomas at 116, quoting Riggs at 511).
The Court went on to find that
“while the wrongdoers in Riggs and Lonergan were already in a position to benefit from their victims’ estates, in the present case, it was the wrongful conduct itself that put Nidia in a position to obtain benefits that were available by virtue of being Howard’s spouse. Thus, while the measures taken by Nidia were certainly not as extreme as those taken in Riggs and Lonergan, the causal link between the wrongdoing and the benefits she sought was actually more direct in this case. . . .
“We find this result to be compelled not only by the need to protect vulnerable incapacitated individuals and their rightful heirs from overreaching and undue influence, but to protect the integrity of the courts themselves. It is ‘an old, old principle’ that a court, ‘even in the absence of express statutory warrant,’ must not ‘ “ ‘allow itself to be made the instrument of wrong, no less on account of its detestation of every thing conducive to wrong than on account of that regard which it should entertain for its own character and dignity’ ” ’ ” (Campbell at 118-119, quoting Matter of Hogan v Supreme Ct. of State of N.Y., 295 NY 92, 96 [1946] [citations omitted]).
*494 Notably, finding the causal link between the wrongdoing and the benefits sought appeared to be a key element of the Court’s determination. This court can only find that the “but for” analysis offered earlier in the instant decision concerning Brandon Palladino’s act(s) and the direct result therefrom (decedent’s death) should prohibit him from obtaining the fruits of such act(s), even though they may be obtained through an intervening estate.
Admittedly, a consistent application of the approach adopted herein could prove to be problematic were there a greater interval between the wrongful act and the wrongdoer’s succession to the funds received by the original heir(s) of the victim. The court is well aware that the tracing of such funds may well prove to be impossible in certain cases due to their conversion, expenditure, depletion, or any other number of reasons. However, to say that potential hurdles to the enforcement of the forfeiture in certain instances should prevent the application in a case such as this, where the precise tracing of the funds produced by the wrong is possible, would make the court a facilitator of the wrongdoer, by shirking its equitable responsibilities under the common law and the long-standing public policy that a wrongdoer should not profit from his or her intentionally committed wrongful acts.
There does not appear to be a New York decision directly on point, however, a 1994 decision from the Appellate Court of Illinois, Fifth District (In re Estate of Vallerius, 259 Ill App 3d 350, 629 NE2d 1185 [1994]), applying the facts of the case to local statute, determined that grandsons who intentionally and unjustifiably participated in their grandmother’s murder could not indirectly inherit their grandmother’s estate through their mother, who post-deceased their grandmother. The appellate court found that existing legislation, which essentially codified the doctrine set forth in cases such as Riggs (supra), was broad enough to allow the court to prevent the murderers from receiving their victim’s property; that “an intervening estate should not expurgate the wrong of the murderer or thwart the intent of the legislature that the murderer not profit by his wrong” (ibid, at 355). The appellate court went on to find that the murderers’ mother’s estate was funded directly from her inheritance from the murder victim, and that the grandsons who caused Mrs. Vallerius’ death could not obtain any property, benefit or other interest under any circumstances that were directly *495 traceable to the victim’s (Mrs. Vallerius’) estate (ibid.). The same court continued this line of reasoning in a case before it the following year (In re Estate of Mueller, 275 Ill App 3d 128, 655 NE2d 1040 [1995]).
The Superior Court of New Jersey, Appellate Division, in the course of finding that the administrator of an insured’s estate was entitled to collect the proceeds of a certain life insurance policy, despite the claim of the contingent beneficiary (the killer’s mother) after the primary beneficiary had killed the insured, held that if judicial policy dictates that the murderer cannot take directly, then technical consistency should not allow him to benefit indirectly via gift to his family member through whom he would acquire property by the statutes of descent and distribution (Bennett v Allstate Ins. Co., 317 NJ Super 324, 330, 722 A2d 115, 117 [1998]).
It is noted that both Illinois and New Jersey had “slayer statutes” at the time the above-referenced decisions were rendered.
Further, the Uniform Probate Code (UPC), although not adopted in New York, provides that “[a] wrongful acquisition of property or interest by a killer not covered by this section must be treated in accordance with the principle that a killer cannot profit from his [or her] wrong.” (UPC § 2-803 [f].) Thus, it would appear that courts of equity would be inclined to expand the concept rather than limit it.
Certainly, consideration on a case by case basis would be in order, but, in reading the New York cases, which are admittedly not directly on point, the out-of-state cases, as well as the Uniform Probate Code, a common thread permeates this issue. Even in the absence of a specific statutory bar to a wrongdoer profiting from his wrong, a court should not, as a court of equity, put itself in the position of assisting the wrongdoer in profiting from his wrong by allowing the use of a technical argument, to wit: that the existence of an intervening inheritor would sufficiently distance the wrongdoer from his wrong so as to permit him to profit thereby.
Based upon the foregoing analysis, and in consideration of the specific facts of this case, this court finds that Brandon Palladino forfeited any claim to assets inherited through his spouse Deanna’s estate that are attributable to captioned decedent’s estate. The court, however, is not directing payment directly to Larsen at this time. Funds may be paid to DiRusso as administrator of the estate of Deanna Palladino solely for the purpose *496 of paying any outstanding debts/creditors of Deanna’s estate. Upon receipt of such assets, Donna DiRusso shall immediately file a bond in the amount of $250,000 (subject to an application to reduce the bond should assets turned over to DiRusso amount to a lower sum). Further, since the finding of this court would essentially allow distribution as though Brandon predeceased Deanna, Deanna’s (contingent) distributees who may not be before this court (in the event there are any in addition to Larsen) would be interested in these proceedings. This court further directs DiRusso, immediately upon receipt of the funds collected from captioned decedent’s estate, to file the aforementioned bond and a petition for judicial settlement of account, but, in no event will the filing of a petition for the judicial settlement of account exceed 60 days from the date of receipt of said funds. Funds allocated to the estate of Deanna Palladino that are traceable to Dianne Edwards’ estate shall continue to be held by the administrator of Deanna Palladino’s estate pending final resolution of any pending appeals concerning Brandon Palladino’s conviction. Further, upon the representation that such appeals are pending, a guardian ad litem will be appointed in the context of the Deanna Palladino estate accounting to report on the status of those appeals, if any, and to represent Brandon’s interest, if any, in the aforementioned accounting of the estate of Deanna Palladino.
In all other respects, the accounting in the estate of Dianne Edwards is judicially settled, except with respect to commissions. There does not appear to be any opposition to the advance payment of commissions, which appear to have been taken on December 6, 2010. The advance payment of commissions is allowed, however, the court cannot condone the fiduciary’s violation of statutory law (SCPA 2310, 2311) by taking same without leave of court. Accordingly, the current fiduciary (O’Connell) is charged with collecting the surcharge against the deceased fiduciary’s estate (Gleason) of interest at the rate of nine percent per annum on the sum of $13,960.24 taken from the date of payment until the date of the decree to be signed herein.